IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROGER GRAEBER,<br><br>  Plaintiff,<br><br>  v.<br><br>THE HEWLETT PACKARD COMPANY<br>EMPLOYEE BENEFITS ORGANIZATION<br>INCOME PROTECTION PLAN, et al.,<br><br>  Defendants._____/ | No. C 05-01124 CRB<br><br>**MEMORANDUM AND ORDER** |

This ERISA lawsuit challenges the termination of plaintiff's long-term disability benefits.

### BACKGROUND

**A.   The ERISA Plan**

This is a dispute about coverage under the Agilent Technologies, Inc. Disability Plan ("the Plan"). The Plan provides that

> [t]he Company is the named fiduciary which has the discretionary authority to act with respect to any appeal from a denial of benefits. The Company's discretionary authority includes the authority to determine eligibility for benefits and to construe the terms of the Plan. The Claims Administrator shall administer the review of denied claims on the Company's behalf and make the decision on review.

Plan § 8(a), Administrative Record ("AR") at 25. The Plan, in turn, gives the Claims

Administrator discretion in reviewing denied claims:

> [t]he Claims Administrator will make the decision on review in conformance with section 503 of ERISA and the regulations thereunder and procedures it has developed in the normal course of its business. The Claims Administrator shall have the discretionary power to construe the language of the Plan and make the decision on review on behalf of the Company.

Id. § 8(c)(iii), AR at 26.

The Plan provides benefits to Plan Members who become "Totally Disabled" as follows:

> (I) During the first fifty-two (52) weeks following the onset of the injury or sickness, the Member is continually unable to perform each and every duty of his or her Usual Occupation; and
>
> (ii) After the initial fifty-two (52) week period, the Member is continuously unable to perform *any occupation for which he or she is or may become qualified by reason of his or her education, training or experience.*

Id. § 2(s), AR at 8 (emphasis added). Thus, after one year of disability the Plan Member may receive benefits only if he cannot perform any occupation, not just his own occupation. Totally disabled includes disability resulting from a mental disorder only if the employee is confined to a hospital for a prolonged period of time. Id. § 2(s)(A), AR at 9. Benefits cease whenever the Claims Administrator determines that the employee is no longer Totally Disabled. Id. § 5(c)(I), AR at 15.

The Plan also provides for "Transitional Return to Work" during the first year (the first 52-week period). The Member may return to work at Agilent or one of its subsidiaries on a part-time basis and receive partial disability benefits provided the employee works at least 20 hours a week. Such work does not make the Member ineligible to receive benefits as "Totally Disabled," but only for the first year. Id. §2(m), (t), §5(g), AR at 7, 11, 20.

**B.     The Administration of Plaintiff's Claim**

Plaintiff was an electrical engineer at Hewlett Packard and later Agilent (after Hewlett Packard created the Agilent spin off). On April 25, 2000, plaintiff applied for benefits under the Plan. He reported pain in his neck, arms, shoulder and wrists when using the computer. His physician, Dr. Dubinsky, diagnosed plaintiff with brachial neuritis, severe pain, and anxiety and depression due to chronic pain. Although plaintiff was working at the time, Dr.

2

Dubinsky recommended that plaintiff not work for four weeks. The claims administrator--Voluntary Plan Associates ("VPA")--approved a four-week total disability leave.

Plaintiff returned to work briefly with accommodations; however, in September 2000 Dr. Dubinsky recommended that plaintiff stay home for one week "to rest up and calm his flare." Soon thereafter she recommended that he be off work until December 1, 2000 because his work restrictions could not be accommodated. VPA approved his claim and the Plan paid him benefits. Dr. Dubinsky recommended that the leave be extended another four months, but also encouraged plaintiff to return to work; for example, she encouraged him to take a position Agilent had offered him that did not involve the use of his hands.

Plaintiff returned to work in early 2001 with accommodations, including working only six hours a day, four days a week. On March 19, 2001, he submitted a claim to the Plan for long-term disability benefits. He claimed brachial neuritis, severe pain, anxiety and depression due to chronic pain, and the inability to set boundaries at work.

Plaintiff's eligibility for benefits for being disabled from *his own occupation* expired in April 2001; thus, in order to receive long-term disability benefits plaintiff had to be totally disabled from working in *any occupation*. VPA initially denied plaintiff's claim for benefits. Plaintiff appealed. As plaintiff was scheduled to have various surgeries to improve his carpal tunnel syndrome, VPA eventually approved his disability claim through March 1, 2002, to give him time to recover from his surgeries (this approval came after VPA stopped benefits on a couple of occasions). Plaintiff had surgery in May, August and October 2001.

Plaintiff's surgeon cleared plaintiff for return to work in January 2002, with no work restrictions. Dr. Dubinsky reported that plaintiff could return to work in March 2002, with certain restrictions, but in a January 2002 progress report she noted that returning to work in February "is within reach." She noted further that "[a]t this point, the stumbling block seems to be returning Mr. Graeber to work when he is in significant pain from the drive there." Dr. Dubinsky's restrictions included a 5 to 10 minute break from sitting every hour, no computer use greater than 5 minutes at a time and only 15-20 minutes per hour, voice activation,

3

ergonomic computer and equipment, and no more than 20 hours of work a week, seven hours at a time.

VPA had retained CorVel Corporation to review plaintiff's claim. In October 2001, CorVel determined that there were no occupations that plaintiff could perform, primarily due to his computer restrictions. CorVel based its finding on the restrictions and limitations set forth in Dr. Dubinsky's Work Status Report/Back To Work Release dated December 12, 2000. In that report Dr. Dubinsky restricted plaintiff from using a computer for more than five minutes at a time, and not more than one hour total a day.

In February 2002, after plaintiff had had his surgeries, CorVel did another assessment. CorVel determined plaintiff's restrictions and limitations based on Dr. Dubinsky's Work Status Report/Back To Work Release dated January 14, 2002. With respect to computer use, CorVel assumed that plaintiff should not use the computer more than five minutes at a time with a maximum of 15-20 minutes per hour. Plaintiff's required accommodations included "voice activation" and ergonomic keyboard, mouse and chair. AR 217. CorVel concluded that in light of the updated information, plaintiff could perform certain engineering positions. CorVel explained its changed recommendation as follows:

> Given Mr. Graeber's severe restrictions with regards to computer use, these types of positions were not considered appropriate. Given the updated medical information received for this employability assessment, it appears that Mr. Graeber would be able to perform these occupations with the modifications of "voice activation," and ergonomic keyboard, mouse and chair.

AR 123.

Shortly after receiving CorVel's February 2002 report, VPA terminated plaintiff's long-term disability benefits effective March 2, 2002. After reciting the evidence in the record, VPA stated that plaintiff no longer met the Plan's definition of "Total Disability" because he is not continuously unable to perform the duties of any occupation.

Plaintiff appealed the denial of benefits. In support of his appeal he submitted later reports from Dr. Dubinsky indicating that he would not able to return to work until May 2003. VPA submitted plaintiff's claim to be reviewed by an independent physician, Dr. Richard Kaplan, a physical medicine and rehabilitation specialist. Dr. Kaplan reviewed

4

plaintiff's file in October 2002, including Dr. Dubinsky's recent progress notes. He also reviewed the May 2002 report of Dr. Noah Weiss, an orthopedic medical surgeon who examined plaintiff as a qualified medical examiner in connection with a different proceeding. According to Dr. Kaplan, Dr. Weiss concluded that plaintiff has no "ratable objective factors of disability." Dr. Kaplan likewise concluded that the medical records do not establish any objective limitations with respect to the rotator cuff disorder and carpal tunnel syndrome.

VPA affirmed the termination of plaintiff's long-term disability benefits. VPA again relied on CorVel's February 2002 report identifying certain occupations that plaintiff could perform with the limitations and restrictions set forth in Dr. Dubinsky's January 14, 2002 Work Status Report. VPA also addressed the additional evidence provided by plaintiff in support of his appeal, and explained why such evidence did not alter VPA's conclusion. This lawsuit followed.

**STANDARD OF REVIEW**

"[A] denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999). When the plan confers discretion on the plan administrator to determine eligibility for benefits, courts review the denial of benefits for abuse of discretion. Id. The "default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision." Kearney v. Standard Ins. Co., 175 F.3d 1084, 1089 (9th Cir. 1999) (en banc). As described above, the Plan here unambiguously gives Agilent and its claims administrator full discretion to decide claims for benefits. Thus, the Court reviews the termination of benefits for abuse of discretion.

Plaintiff nonetheless argues that de novo review applies. First, he contends that the Plan does not give the claims administrator discretion. This argument is belied by the plain language of the Plan: "The Claims Administrator shall have the discretionary power to

5

construe the language of the Plan and make the decision on review on behalf of the Company."

Next, plaintiff argues that Agilent had a conflict of interest as it funds the Plan, and therefore the claims administrator, VPA, by acting on behalf of Agilent, also had a conflict of interest warranting de novo review.

The degree of judicial deference given to a plan administrator's decision may be affected by an administrator's conflict of interest. See Lang v. Long Term Disability Plan of Sponsor Applied Remote Technology, Inc., 125 F.3d 794, 797 (9th Cir. 1997). The fact that an administrator has a conflict of interest does not mean that the district court automatically applies a less deferential standard of review; rather, the beneficiary bears the burden of showing that the conflict may have influenced the decision. See id. "To make such a showing, the affected beneficiary must come forward with 'material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary.'" Id. (citation omitted). If the beneficiary meets that burden, a rebuttable presumption in favor of the beneficiary arises. See Tremain v. Bell Indus. Inc., 196 F.3d 970, 976 (9th Cir. 1999). "The plan then 'bears the burden of rebutting the presumption by producing evidence to show that the conflict of interest did not affect its decision to deny or terminate benefits.'" Id. (citation omitted). If the plan fails to rebut the presumption, the district court reviews the plan's benefits decision de novo. See id.

Plaintiff's argument fails for two reasons. First, he has failed to show that VPA had a conflict of interest. As plaintiff admits, the record demonstrates that VPA made the decision to terminate plaintiff's benefits and deny his appeal without any consultation with Agilent. Plaintiff has not shown that VPA had any financial interest in its decision. In Finley v. Hewlett-Packard, 379 F.3d 1168, 1177 (10th Cir. 2004), for example, the Tenth Circuit found that VPA did not have a conflict because Hewlett-Packard paid it a flat rate and it was not given any financial incentive for denying claims. Plaintiff has not submitted any evidence to the contrary here.

6

Second, even assuming VPA had a conflict of interest, plaintiff has not "come forward with material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary." Thus, the Court reviews the termination of benefits for an abuse of discretion.

When courts review for abuse of discretion, "it is because the plan has put the locus for [the court's] decision in the plan administrator, not in the court, so [the courts] cannot substitute [their] judgment for the administrator's." Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 875 (9th Cir. 2004). A court can set aside the "administrator's discretionary decision only when it is arbitrary or capricious." Id. A "decision 'grounded on *any* reasonable basis' is not arbitrary or capricious." Id. (citation omitted).

## DEFENDANTS' MOTION TO STRIKE

In support of his motion for summary judgment, plaintiff submits several documents that are not part of the administrative record. Plaintiff does not contend that VPA had the documents and refused to consider them; rather, he argues that since he submitted the documents to Agilent's workers compensation administrator and/or to Agilent, VPA should be charged with knowledge of the documents. He does not cite any support for this novel argument.

The abuse of discretion standard permits the district court to review only the record that was before the plan administrator at the time the decision to terminate benefits was made. See Taft v. Equitable Life Assur. Soc., 9 F.3d 1469, 1471 (9th Cir. 1993). "Permitting a district court to examine evidence outside the administrative record would open the door to the anomalous conclusion that a plan administrator abused its discretion by failing to consider evidence not before it." Id. at 1472. As plaintiff does not contend that defendants' administrative record is missing any documents which were in fact provided to VPA, the Court strikes plaintiff's exhibits and instead limits its review to the administrative record as submitted by defendants, except where otherwise noted.

7

**DISCUSSION**

**A.    First Claim for Relief: Termination of benefits**

The issue before the Court is whether VPA abused its discretion by finding that plaintiff did not qualify as Totally Disabled under the "any occupation" standard--the standard that applies after the first 52 weeks of disability. Under that standard, plaintiff was Totally Disabled only if he was "continuously unable to perform any occupation for which he or she is or may become qualified by reason of his or her education, training or experience." "The language of the 'any occupation' standard is not demanding." McKenzie v. General Telephone Co. Of California, 41 F.3d 1310, 1317 (9th Cir. 1996). Plaintiff was not Totally Disabled under this standard if he was able to perform a job for which he was qualified or for which he reasonably could become qualified by training, education or experience. See id.

VPA approved plaintiff's claim for benefits in 2001 under the "any occupation" standard. VPA has explained that it paid benefits because plaintiff received and needed to recover from three surgeries in May, August and October and thus could not work at all. VPA claims that when plaintiff's physicians cleared him to return to work, albeit part time and with certain other restrictions, he was no longer "continuously unable to perform" any occupation and therefore not disabled. This argument raises two issues. First, was VPA's determination that plaintiff could work part time in any occupation an abuse of discretion? Second, does plaintiff's ability to work part time with certain accommodations mean that he was *not* continuously unable to perform any occupation.

**1.    Substantial evidence supports the finding that plaintiff could work part-time at any occupation**

Substantial evidence supports VPA's determination that by March 2002 plaintiff could work at least part time with certain restrictions. First, in January 2002 plaintiff told Dr. Dubinsky that plaintiff's surgeon, Dr. Mazur, had returned plaintiff to work with no restrictions. AR 95. This assertion is corroborated by an Agilent "Continuation of Disability" form completed by Dr. Mazur in December 2001 that estimated that plaintiff would be able to return to work in January 2002 and did not place any restrictions on his ability to work. AR 250.

8

Second, Dr. Dubinsky's January 14, 2002 Progress Report states that "Mr. Graeber is able to return to work with previous modifications given in the past . . ." She also wrote that "Previous return to work date was estimated 3/1/02, but it appears 2/1/02 is within reach." AR 95. Indeed, plaintiff did briefly return to work in February, before Agilent laid him off.

Third, in February 2002, CorVel identified three occupations that plaintiff could perform even with the restrictions imposed by Dr. Dubinsky in January 2002.

This evidence provides a "reasonable basis" for VPA's decision and therefore cannot be considered arbitrary and capricious. See Jordan, 370 F.3d at 875. VPA was not required to personally call Dr. Mazur to determine if he had in fact released plaintiff for work; plaintiff's assertion to the contrary is unsupported. Moreover, it was not unreasonable for VPA to rely on that release given that, according to the notes of plaintiff's treating physician, plaintiff admitted that he had been released to work. It was also not unreasonable to rely on plaintiff's statement in the Progress Report. Nothing in ERISA makes it an abuse of discretion to rely on such hearsay and, in any event, there is a hearsay exception for statements made to a medical professional for the purpose of receiving treatment. See Fed.R.Evid. 803(4).

VPA also did not abuse its discretion by disregarding Dr. Dubinsky's March 2002 opinion that plaintiff "cannot compete in the open labor market with his work restrictions." VPA hired a vocational consultant who accepted Dr. Dubinsky's work restrictions and identified three occupations which plaintiff could perform. ERISA does not require VPA to accept Dr. Dubinsky's opinion, especially when the opinion changed after Agilent laid plaintiff off and VPA terminated his benefits. Similarly, that there is other evidence in the record which would support a finding that plaintiff could not work at all does not make VPA's decision an abuse of discretion.

It should also be noted that plaintiff's age (56) does not mean he is unemployable. See McKenzie v. General Telephone Co. of California, 41 F.3d 1310, 1317 (9th Cir. 1994)

9

(finding at a 52-year old with a bachelors and masters degree was not unemployable due to his age).

### 2. Plaintiff is not "Totally Disabled" if he can work part time

Having determined that VPA did not abuse its discretion in finding that plaintiff could work at least 20 hours a week in an identified occupation, the next question is whether plaintiff's ability to work only part time means that plaintiff is "continuously unable" to work in any occupation and therefore entitled to disability benefits.

The words themselves--continuously unable to work at any occupation--suggest that in order to be considered Totally Disabled, a Member must not be able to work at all, not even part time. The opinions of several federal courts are in accord. See Brigham v. Sun Life Canada, 317 F.3d 72, 83-84 (1st Cir. 2003) (holding that the "any occupation" standard means physically unable to work, even on a part-time basis); Bond v. Cerner Corporation, 309 F.3d 1064, 1067 (8th Cir. 2002) (holding that claimant's part-time work precluded claimant from establishing that she could not continuously perform the substantial and material duties of any occupation); Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 186 (1st Cir. 1998); Shane v. Albertson's Inc. Employees' Disability Plan, 381 F.Supp.2d 1196, 1206 (C.D. Cal. 2005) (employee who could work part time not totally disabled); see also Mullay v. First Reliance Standard Life Ins., Co., 253 F.Supp.2d 279, 283 (C.D. Conn. 2003) ("In the absence of clear language permitting part-time employment, courts have uniformly declined to consider a claimant, who is capable of working part-time, eligible for benefits under a general disability policy").

The cases cited by plaintiff are distinguishable. As plaintiff concedes, Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455 (9th Cir. 1996) involved the more restrictive "own occupation" disability standard, as does Seitz v. Metropolitan Life Ins., 433 F.3d 647, 651 (8th Cir. 2006). In Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003), the court stated that a plan member's full-time work not mean that he is not disabled from working full time: the plan member may have pushed himself to work, but cannot now maintain that effort. Here, in

10

contrast, VPA did not terminate plaintiff's benefits because he was working; it terminated his benefits because his physicians, including his treating physician, reported that he could work 20 hours a week with certain accommodations.

In <u>Bruce v. New York Life Ins. Co.</u>, 2003 WL 21005313 (N.D. Cal. 2003), the district court held that the term "another occupation" meant that the plan member is totally disabled unless the member can work full time. The decision is unpersuasive for several reasons. It does not rely on any ERISA case law for its definition, and, in particular, does not address the caselaw the Court cited above which provides that one is not totally disabled from "any occupation" if he or she can work part time. It also relies on social security caselaw, but since <u>Bruce</u> was decided the Supreme Court has held that courts should not import social security caselaw into ERISA. <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 833 (2003). Further, the court found that the interpretation of "another occupation" as meaning any "full-time occupation" was consistent with the defendant's prior practices, and that the plan's juxtaposition of "usual occupation" (which was full time) with "another occupation" was further support for the court's construction. Neither of those considerations applies here. <u>See also</u> <u>Shane</u>, 381 F.Supp.2d at 1204 (declining to follow <u>Bruce</u>).

Plaintiff also appears to argue that because the Plan provides for Transitional Benefits for employees working a reduced schedule, but at least 20 hours a week, plaintiff's treating physician's statement that plaintiff could work 20 hours a week does not mean he is not Totally Disabled. The plain language of the Plan, however, provides for such partial benefits *only for the first 52 weeks of disability*--plaintiff's first 52 weeks ended in April 2001.

Plaintiff also points to sections 5(h) and (I) of the Plan to support his contention that a Plan member is Totally Disabled and entitled to benefits even if he can work part time at some occupation. Section 5(h) is entitled "Effect of Employment Other Than Transitional Return to Work" and provides that

> [i]f a Member, while receiving Plan benefits, continues to be Totally Disabled but, with the approval in advance by the Claims Administrator, is employed (on either a full or part time basis) or is self employed for profit at a time or in a capacity which does not constitute Transitional Return to Work, earnings or profits from such employment will be offset in full against the Member's benefits under this Section 5.

11

Section 5(I), entitled "Advance Approval of Employment," then explains the "advance approval" requirement of section 5(h): "[i]f a Member who is receiving benefits under the Plan wishes to become self employed or to work for others (on either a full or part time basis), such Member must obtain advance written approval of such employment from the Claims Administrator. If the Member fails to obtain such approval and such failure is not due to reasonable cause, effective as of the commencement of such employment, the Member shall cease to be eligible to receive benefits." Plan, section 5(I).

Unlike the Transitional Return to Work section, nothing in sections 5(h) provide that the Member's ability to work and still receive benefits is limited to the first 52 weeks of disability. The Transitional Return to Work provision states explicitly that "[s]uch Transitional Return to Work <u>shall not extend beyond fifty-two (52) weeks from the onset of Total Disability</u>." (Emphasis added). Sections 5(h) and (I) contain no such statement; thus, sections 5(h) and 5(I) apply under the "any occupation" standard that takes effect after the first year of disability. Plaintiff argues that if a Member can, with claims administrator approval, be considered Totally Disabled and receive benefits even while working part time for another, then it cannot be that simply because a Member's physician clears him to work part time that necessarily means the employee does not satisfy the disabled from working at "any occupation" standard. Thus, the argument goes, it was an abuse of discretion for VPA to terminate his benefits on the ground that his physicians cleared him for part-time work with accommodations.

VPA responds that it has reasonably interpreted sections 5(h) and (I), like the Transitional Return to Work provision, to apply only during the first year of disability when the "own occupation" standard of total disability governs. To interpret it otherwise, it contends, would make no sense: it would mean that person could be considered continuously unable to perform any occupation for which he or she is or may become qualified by reason of his or her education, training or experience and therefore entitled to long-term disability benefits while at the same time working, even working full-time, at another occupation.

"An ERISA plan administrator abuses its discretion if it construes provision of the plan in a way that 'conflicts with the plain language of the plan.'" Saffle, 85 F.3d at 458 (citation omitted). The Court's "inquiry is not into whose interpretation of the plan documents . . . is most persuasive, but whether the plan administrator's interpretation is unreasonable." Id. (internal quotation marks and citations omitted); see also McDaniel v. Chevron Corp., 203 F.3d 1099, 1113 (9th Cir. 2000) ("The question we must ask is not whose interpretation of the plan documents is most persuasive, but whether the interpretation is unreasonable") (citation omitted).

While it is baffling that the Plan drafters did not explicitly state that section 5(h) is limited to the first 52 weeks of disability, VPA's interpretation of section 5(h) as being so limited is not unreasonable; indeed, the language of section 5(h) is consistent with its interpretation. It provides that if a Member "is self employed for profit at a time or in a capacity which does not constitute *Transitional Return to Work,* earnings or profits from such employment will be offset in full against the Member's benefits under this Section 5. (Emphasis added). As Transitional Return to Work benefits only exist during the first 52 weeks of disability, section 5(h)'s reference to work that does not constitute Transitional Return to Work must mean that the Plan is referring to work during the first 52 weeks of disability, that is, when the "own occupation" rather than "any occupation" standard applies.

Plaintiff's reliance on deposition testimony in another case involving a different Hewlett-Packard plan is unpersuasive. See Plaintiff's Exhs. 82, 96. His claim that VPA never asserted that plaintiff was not entitled to benefits because his physicians had cleared him for work part time is equally unpersuasive. The letter terminating plaintiff's benefits recited the evidence of plaintiffs' physicians clearing plaintiff for work, and the letter denying his appeal cited the same evidence and Cor-Vel's identifications of occupations that plaintiff could perform.

In sum, the Court rejects plaintiff's assertion that a Plan Member is entitled to long-term disability benefits unless he can work full time in any occupation. Plaintiff's argument is belied by the plain meaning of the "any occupation" standard and the caselaw.

13

### 3. CorVel reports

Plaintiff also challenges VPA's determination that there are positions available at which he could work with his limitations and restrictions. In October 2001, CorVel, the vocational consultant, looked at the restrictions imposed by Dr. Dubinsky in December 2000, and in particular the restriction on computer use, and opined that plaintiff could not work at any occupation. In February 2002, CorVel identified the restrictions imposed by Dr. Dubinsky in January 2002 and opined that plaintiff could work at the same occupations it had previously considered and rejected. The only difference in the restrictions is that for the October 2001 report plaintiff was limited to computer usage five minutes at a time for one hour a day, whereas in January it was five minutes at a time for 15 to 20 minutes an hour. Dr. Dubinsky limited plaintiff to seven hours of work a day; thus, at most, Dr. Dubinsky released plaintiff to two hours and 20 minutes of computer time a day versus the earlier one hour restriction. The later CorVel report also noted that Dr. Dubinsky had suggested that plaintiff use "voice activation" software and ergonomic keyboard, mouse and chair.

VPA's reliance on the February 2002 report was not an abuse of discretion. There is a rational basis for CorVel's reversal on the availability of jobs for plaintiff; namely, the increased amount of time in which his treating physician stated he could engage in computer use. There is nothing in the record that suggests CorVel's new position was arbitrary, or that VPA knew, or at least should have know, that CorVel's opinion was wrong.

## B. Second claim for relief

In plaintiff's second claim for relief he contends that VPA did not provide him with documents as required by ERISA in a timely manner and therefore the Court should penalize VPA . His initial memorandum in support of his motion for summary judgment did not offer any evidence whatsoever in support of this claim; instead, all of his evidence and argument are in his rebuttal brief.

At the request of a plan participant or beneficiary, a plan administrator must provide the participant or beneficiary with an updated plan summary, a plan description, and the latest instrument under which the plan is established or operated. 29 U.S.C. § 1024(b)(4). If a plan

14

administrator fails to comply with such request within 30 days, a court, in its discretion, may award penalties of up to $100 a day.

The Court declines to award such penalties here. Most of the documents that plaintiff claims he was not provided in a timely manner are not covered by ERISA section 1024. The untimely production of documents that plaintiff claims prejudiced him are not documents covered by the statute. Even though defendants made this argument in their opposition, plaintiff's rebuttal memorandum fails to address it. Moreover, VPA did respond to plaintiff's request in a timely manner, and provided plaintiff with many of the documents he requested, even some documents that ERISA does not require it to produce. In sum, the Court concludes that VPA made a good faith effort to comply with plaintiff's request and therefore penalties are not warranted.

## CONCLUSION

Based on the Court's review of the administrative record under an abuse of discretion standard, VPA's termination of plaintiff's long-term disability benefits is AFFIRMED. Defendants' motion for summary judgment on plaintiff's first and second claims for relief is GRANTED and plaintiff's motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated: March 16, 2006

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE